## AFFIDAVIT

STATE OF WEST VIRGINIA

COUNTY OF RALEIGH, to-wit:

Your affiant, ATF Task Force Officer Jason Redden, being duly sworn, deposes and states as follows:

1. This Affidavit is submitted in support of a search warrant to enter the premises at 205 Gregory Street, Beckley, Raleigh County, West Virginia 25801 (hereinafter "TARGET LOCATION") and to search for and seize fruits, evidence, and instrumentalities of the federal offenses, including but not limited to 21 U.S.C. §§ 841(a)(1) and 846. There is probable cause to believe that items, materials, and objects described in Attachment B will be located inside the TARGET LOCATION.

## RELEVANT TRAINING AND EXPERIENCE

2. I am a certified law enforcement officer in the State of West Virginia. I am employed as a Deputy Sheriff with the Raleigh County Sheriff's Office and have been so employed since July of 2016. I am currently assigned to the Beckley/Raleigh County Drug and Violent Crime Unit. I am also assigned as a full-time task force officer for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

3. During my employment with the Raleigh County Sheriff's Office, I have participated in many different types of criminal investigations, including but not limited to drug trafficking and distribution investigations, firearm offenses, kidnapping, robbery, homicide, sexual assault, other violent crimes, financial fraud, property crimes, child exploitation crimes, missing person cases, terroristic threat investigations, as well as matters relating to disposition and tracking of stolen property. I have also received specialized training relating to firearms offenses and drug investigations involving the trafficking of narcotics and drug trafficking organizations. In my

capacity as a Deputy, I have received training and gained experience by conducting and participating in drug investigations regularly. I have a working knowledge and experience in relation to the methods, terminology, and business practices used by traffickers of illegal controlled substances. On numerous occasions, I have used cooperating individuals and confidential informants in the course of investigating the distribution of illegal controlled substances.

4. Your affiant is familiar with United States Code; 21 U.S.C. § 841(a)(1) – possession with intent to distribute a controlled substance. It shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

5. Your affiant is familiar with United States Code; 21 U.S.C. § 846 – attempt and conspiracy. Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## STATEMENT OF PROBABLE CAUSE

6. The United States, including the ATF and the FBI, is conducting a criminal investigation of Ronald Lavaughn MASON (hereinafter MASON), Tilford Joe BRADLEY (hereinafter BRADLEY) and other members of their drug trafficking organization (hereinafter DTO) regarding TARGET OFFENSES within the Southern District of West Virginia (WV) in violation of federal law.

7. On June 28, 2023, BRADLEY was charged by the Raleigh County Sheriff's Office for possession of fentanyl and cocaine with the intent to deliver after a search warrant was executed at his residence of 110 Copiniti Street, Beckley, West Virginia. After the arrest BRADLEY gave a mirandized statement during that investigation, during which he identified MASON as his source of crack cocaine.

8. On November 6, 2023, a confidential informant (hereinafter CI) performed a controlled drug purchase operation from BRADLEY at his residence at 110 Copiniti Street, Beckley, West Virginia. During the operation BRADLEY was seen counting a large amount of US currency and told the CI that he had to pay his source. As the CI was leaving the residence, MASON was observed by law enforcement arriving at BRADLEY's residence. During a post operation debrief, the CI told law enforcement that MASON was the drug supplier that BRADLEY was referring to.

9. On April 4, 2024, the Honorable Thomas E. Johnston, Chief United States District Court Judge in the Southern District of West Virginia, entered orders authorizing the interception of wire and electronic communications over TARGET Telephone #1, a telephone used by BRADLEY; and wire communications over TARGET TELEPHONE#2, a telephone used by Heather DUNBAR, a member of the DTO, for thirty days.

10. Based on wire intercepts from TARGET TELEPHONE #1, it is clear that MASON, using telephone number (681)305-9553, engages in conversation related to drug trafficking. As discussed below, MASON, using telephone number (681)305-9553 has been intercepted over TARGET TELEPHONE #1. For instance, on April 4, 2024 at 10:08 PM, BRADLEY, on TARGET TELEPHONE #1 (Session 00070), placed an outgoing call to MASON on telephone number (681)305-9553. The following was discussed:

BRADLEY: Hey I need a whole one and a half of girl.

MASON: Alright.

BRADLEY: And I got what I owe ya, whole and a half. Yea right here.

MASON: Where you at?

BRADLEY: I'm at my house, whew, I'm sorry big dog, I'm trying to get things together man.

MASON: I'll call you in about ten minutes, about fifteen minutes from my cell.

> BRADLEY: (Inaudible)
>
> MASON: Alright.

11. Based on my training, experience and the investigation thus far, BRADLEY asked MASON for one and a half ounces of cocaine. It is common for drug traffickers to use the word whole to mean a whole ounce of narcotics. I also know from experience that "GIRL" is commonly used as a slang word that means cocaine.

12. On April 9, 2024, at 5:33 PM, Bradley, on TARGET TELEPHONE #1 (session 01905), placed an outgoing call to MASON on telephone number (681)305-9553. The following was discussed.

> BRADLEY: How many are um for that other, half too?
>
> MASON: Where you gonna be in about 20 minutes?
>
> BRADLEY: Ima be in Beaver.
>
> MASON: Bet I'll call you and we can do it all at Kroger.
>
> BRADLEY: Alright bet I gotchu bro.
>
> MASON: Yep yep.

13. Based on my training, experience and the investigation thus far, I believe that BRADLEY called to ask for the other half meaning the other half of an amount of drugs that he needs from MASON. Bradley tells MASON that he is in Beaver and MASON tells him we can do it all at Kroger. It is believed that MASON is going to deliver BRADLEY the drugs at Kroger in Beaver in about 20 minutes.

14. On April 9, 2024, at 6:14 PM, MASON, on telephone number (681)305-9553 (session 01930), placed an outgoing call to BRADLEY on TARGET TELEPHONE#1. The following was discussed.

BRADLEY: What'd you say?

MASON: You there?

BRADLEY: I'm pulling up I'm going over there right now.

MASON: Alright I'll be right by, whatchu in?

BRADLEY: I'm in the BMW, cream colored BMW.

MASON: Alright.

BRADLEY: Well white.

MASON: Alright I'll see you in about 3 minutes.

BRADLEY: Alright bet.

15. On this same date and time law enforcement was conducting surveillance pertaining to this phone call. At approximately 5:44 PM surveillance officers observed MASON's black Buick sedan at the TARGET LOCATION. At approximately 6:17 PM surveillance saw BRADLEY pull into a parking spot at Kroger in Beaver, West Virginia. At the same time MASON's black Buick sedan was observed traveling from the area of Gregory Street and driving in the direction of BRADLEY. Law enforcement followed MASON's sedan all the way to Kroger in Beaver and ovserved it pull into a parking spot next to BRADLEY at approximately 6:20 PM. Surveillance then saw BRADLEY exit his white BMW and enter MASON's Buick sedan. After approximately 1 minute, BRADLEY exited the Buick sedan. Surveillance confirmed MASON was driving the Buick. After BRADLEY exited, MASON departed the parking lot. A surveillance team followed MASON as he began to travel back towards the TARGET LOCATION. The surveillance team followed MASON back to the area of the TARGET LOCATION before they lost visual contact due to counter surveillance tactics.

16. On May 6, 2024, the Honorable Thomas E. Johnston, Chief United States District Court Judge in the Southern District of West Virginia, entered orders authorizing the interception of wire and electronic communications over TARGET TELEPHONE #3, a telephone used by MASON, for thirty days.

17. On May 9, 2024, at 9:22 PM, MASON, on TARGET TELEPHONE#3 (session 00536), placed an outgoing call to Anthony ANDREWS on phone number (304)661-3125. The following was discussed.

> MASON: Ah. What you got goin' on tomorrow?
>
> ANDREWS: Uh. I gotta work but I can make, I can make somethin' shake.
>
> MASON: You can get up here?
>
> ANDREWS: Uh. Yea. What time you thinkin'?
>
> MASON: What time do you get off from work?
>
> ANDREWS: Uh. Probably like, I'd say like four. I could probably cut out around three, around four.
>
> MASON: Alright, so uh.
>
> ANDREWS: But I'd probably, I'll probably have to have somebody bring me a shorty or somethin' cause my, my car's in the shop.
>
> MASON: Ya. That's cool.
>
> ANDREWS: Word.
>
> MASON: We can try to do the, uh. What's you, What'd you say, trynna put in motion?
>
> ANDREWS: Um. Uh. Like I said... I got... Like I basically... So I just picked up like a new, like a, like a new person that they tryin' to buy like off me cause I can give them a better price, you know what I mean, on the girl. And uh, I basically got like one gone immediately soon as I touch back down here basically. Um. But then I got my other motion and shit like what I do, you know what I mean, so like, I can make shit shake pretty fast. I'm not tryin' to really deal with that other shit, you know what I mean. I am still. But you know what I mean.
>
> MASON: [Unintelligible]

ANDREWS: You said what?

MASON: What you tryin' to do just fuck wit' the girl?

ANDREWS: Yeah, I still want that other shit though, cause, you know, I mean, I still got a lane for it, but like, I'm just tryin' to taper that shit, like keep it, keep it like, kind of copacetic, you know what I mean, cause that shit's gettin' kinda out of hand down here and they really tryin' to crack down on that shit.

MASON: Uh. Im'ma get you... Say... You have a two?

ANDREWS: You said a two, the two, the two girl?

MASON: Ya.

ANDREWS: Alright. That's cool.

MASON: And what do you want? Two, two balls of the uh. Slow?

ANDREWS: Ya. Ya. We can do, I mean, we can do the two and I mean, but, I mean if you wanna that. I mean, I'm cool with that. It's whatever you wanna do, bro.

MASON: I mean like.

ANDREWS: I just, I just don't wanna do like, cause like one thing I hate is like traffic, cause like say if I get down here and I fuck around, and get it gone fast. You know what I mean? And then I have to like slide right back on you.

MASON: Ya. That's why, that's why I'm tryin' to up it. You know what I'm sayin'?

ANDREWS: Nah. Ya. So. Ya. I mean that's cool. So we can do that.

MASON: Alright. So that'll be uh. Yea.

ANDREWS: So it would be the, um, it would be the, so it'll be two and so.

MASON: That way, it'll be like thirty fifty, twenty two, then the eight five.

ANDREWS: Yea.

MASON: That's good. Just hit me up. Lemme know.

ANDREWS: Aight. I gotchu. Uh. Where, where kind of like, where do you like wanna meet tomorrow?

MASON: What's up with you? Alright [Talking to someone else] What'd you say man?

ANDREWS: I said, "Where would you wanna meet tomorrow?"

MASON: Shit, It'd, Ahhh. Eh. Eh. How good you know Beckley?

ANDREWS: I mean, uh uh, I mean, I know Beckley, but I don't really fuck around in Beckley.

MASON: Shit. We could definitely meet somewhere so like what like the mall or somethin'?

ANDREWS: Uh. Like Grandview or?

MASON: Can you get to the mall cause I don't really like fuckin' around down that way, be a lot of mother fuckin', like uh.

ANDREWS: OK. Nah yea. I can do that. I'll, I'll figure it out. I'll make it shake. I'll get it lined up like right now and I'll let you know.

MASON: Alright.

ANDREWS: Alright bro.

MASON: Bet.

18. Based on my training, experience and the investigation thus far, I believe that MASON asked ANDREWS if he was ready to purchase drugs off of him tomorrow ("Ah. What you got goin' on tomorrow?" "You can get up here?"). ANDREWS replied and indicated that he had to work but would meet with MASON to purchase drugs ("Uh. I gotta work but I can make, I can make somethin' shake."). After discussing times and logistics, MASON asked ANDREWS what he wanted to purchase ("We can try to do the, uh. What's you, What'd you say, trynna put in motion?"). ANDREWS said he had a new customer for cocaine for one ounce at a time and could sell that as soon as he got back. ANDREWS also said that he had his other customers and could sell more pretty quickly ("Um. Uh. Like I said... I got... Like I basically... So I just picked up like a new, like a, like a new person that they tryin' to buy like off me cause I can give them a better price, you know what I mean, on the girl. And uh, I basically got like one gone immediately soon as I touch back down here basically. Um. But then I got my other motion and shit like what I do,

you know what I mean, so like, I can make shit shake pretty fast. I'm not tryin' to really deal with that other shit, you know what I mean. I am still. But you know what I mean."). MASON asked ANDREWS if he wanted two ounces of cocaine ("Uh. Im'ma get you... Say... You have a two?"), which ANDREWS confirmed ("You said a two, the two, the two girl?"). MASON asked ANDREWS if he also wanted two 3.5 gram packages of heroin ("And what do you want? Two, two balls of the uh. Slow?") which ANDREWS confirmed and told MASON it was whatever MASON wanted to give him ("Ya. Ya. We can do, I mean, we can do the two and I mean, but, I mean if you wanna that. I mean, I'm cool with that. It's whatever you wanna do, bro."). ANDREWS said that he didn't want to get too little of an amount because he didn't want to sell it too fast and have to come right back to MASON to get more ("I just, I just don't wanna do like, cause like one thing I hate is like traffic, cause like say if I get down here and I fuck around, and get it gone fast. You know what I mean? And then I have to like slide right back on you."), to which MASON replied that was why he was trying to increase the amount of drugs he was giving to ANDREWS ("Ya. That's why, that's why I'm tryin' to up it. You know what I'm sayin'?"). ANDREWS agreed to the amounts ("Nah. Ya. So. Ya. I mean that's cool. So we can do that."). MASON and ANDREWS then discussed a plan on where to meet the next day.

19. On May 10, 2024, 5:11 PM, Anthony ANDREWS, on (304)661-3125, placed an outgoing call to MASON on TARGET TELEPHONE#3 (session 00629). The following was discussed.

MASON: Hello.
ANDREWS: Yo, I, I'm here. I'm about to park in front of Dick's.
MASON: Alright. Gimme, I be there in about ten minutes.
ANDREWS: Alright. I'm in, I'm in a U'Haul.

MASON: Alright. I gotta black, I gotta black Buick LaCrosse. Alright.

ANDREWS: Alright.

20. Based on my training, experience and the investigation thus far, I believe that ANDREWS called MASON to tell him that he was parked in front of Dick's Sporting Goods ("Yo, I, I'm here. I'm about to park in front of Dick's."). MASON told ANDREWS that he would be there in ten minutes ("Alright. Gimme, I be there in about ten minutes."). ANDREWS told MASON that he was in a U'Haul truck ("Alright. I'm in, I'm in a U'Haul.), to which MASON replied that he was in a black Buick LaCrosse ("Alright. I gotta black, I gotta black Buick LaCrosse. Alright.").

21. Law enforcement conducting surveillance on May 10, 2024 made the following observations: At approximately 4:52 PM MASON was seen leaving the TARGET LOCATION in his Buick sedan. At approximately 5:00 PM, MASON arrived at the Family Dollar located on S. Fayette Street in Beckley and appeared to do a hand to hand with an unknown male. MASON leaves the Family Dollar and travels to 111 Mool Avenue in Beckley, where he arrived at approximately 5:05 PM. Mason was seen meeting with Kimberly Logan and appeared to do a hand-to-hand transaction. At approximately 5:11 PM, a U'Haul truck arrived at the Crossroads Mall near Dick's Sporting Goods. At approximately 5:15 PM, MASON met with an unknown male at the entrance to Cobb Street in Beckley and appeared to do a hand to hand transaction with the male. At approximately 5:26 PM, MASON was observed turning into the mall in his known black Buick LaCrosse. At approximately 5:27 PM, MASON parked next to the U'Haul and the driver of the U'Haul exited the truck and got in MASON's vehicle. At approximately 5:29 PM, the driver of the U'Haul exited MASON's vehicle, got back in the U'Haul, and then went inside the mall. At approximately 6:20 PM, the driver of the U'Haul got back in the truck and left the mall approximately four minutes later. Law enforcement maintained surveillance on the U'Haul as it traveled on Interstate 64 into Greenbrier County, West Virginia. The U'Haul was traffic

stopped near mile marker 158 ½ on Interstate 64 at approximately 7:14 PM. The driver was identified as ANDREWS. ANDREWS gave consent to law enforcement to search the vehicle and law enforcement located and recovered approximately two ounces of suspected cocaine and approximately one-half ounce of suspected heroin. After the traffic stop ANDREWS agreed to speak with law enforcement. During a statement with law enforcement ANDREWS indicated that the cocaine and heroin located inside the U'Haul was just purchased from MASON by ANDREWS.

22. On May 12, 2024 at 3:19 PM, MASON, on TARGET TELEPHONE #3 (Session 00819), placed an outgoing call to GIVENS on (304)207-3144. The following was discussed:

GIVENS: Yo.

MASON: Whats up with you? I was in the shower.

GIVENS: Oh I ain't doing nothing [UI] sitting here man, shit I'm gotta come over to that side, I come holla at you when ever you get time let me know.

MASON: Yeah I'm going to hit you up, I just got to run and grab it around the corner, I got you.

GIVENS: Ok, alright bet.

MASON: Same thing?

GIVENS: Yeah, yup.

MASON: Alright I got you.

GIVENS: Hey, um matter of fact just that and I'll just do it again later, cause they going to come back later too.

MASON: What you need, two balls?

GIVENS: Yeah but they only need one right now, I mean I'll just wait and do it later I'll just wait and do it later.

MASON: Oh ok, I was going to say shit if not I mean I separate it for you, its up to you.

GIVENS: What you say?

MASON: I mean, its up to you, you know keep the running down, if you need it.

GIVENS: Ok yeah yeah, just do two of them then, I'll come over there. I'll be over that way in a little bit. Just when ever you ready, whenever you ready just holla at me.

MASON: Alright I will.

23. Based on my training, experience and the investigation thus far, GIVENS asked MASON if he could come by MASON's residence in order to make a purchase of controlled substances ("Oh I ain't doing nothing [UI] sitting here man, shit I'm gotta come over to that side, I come holla at you when ever you get time let me know."). Mason confirmed that he could but that he had to go to another location first to obtain the drugs ("Yeah I'm going to hit you up, I just got to run and grab it around the corner, I got you."). MASON asked GIVENS if he wanted the same thing ("Same thing?") and GIVENS told MASON that he wanted one quantity now and another one later because his customer was going to want another one later ("Hey, um matter of fact just that and I'll just do it again later, cause they going to come back later too."). MASON asked if GIVENS meant that he needed two, 3.5-gram packages, also known as "balls" ("What you need, two balls?") and GIVENS said that he did because his customer needed one now and another ("Hey, um matter of fact just that and I'll just do it again later, cause they going to come back later too."). MASON told GIVENS that he would supply GIVENS with two, 3.5-gram packages now so he would not have to come back again ("Oh ok, I was going to say shit if not I mean I separate it for you, its up to you." "I mean, its up to you, you know keep the running down, if you need it."). GIVENS confirmed that he wanted two packages and asked MASON to call him when he

had the drugs ready ("Ok yeah yeah, just do two of them then, I'll come over there. I'll be over that way in a little bit. Just when ever you ready, whenever you ready just holla at me.").

24. On May 12, 2024 at 5:32 PM, GIVENS, on (304)207-1344, placed an outgoing call to MASON on TARGET TELEPHONE #3 (Session 00832). The following was discussed:

MASON: Yo.

GIVENS: What up champ?

MASON: What's up with you?

MASON: Nah, I'm just over here at the crib

GIVENS : Oh okay, shit you had time yet?

MASON: Yeah.

GIVENS: I ain't know you ain't never called me back.

MASON: Nah I just got back. I just went and grabbed it.

GIVENS: Oh okay, shit I'm about to swing by.

MASON: Alright.

25. Based on my training, experience and the investigation thus far, GIVENS asked MASON if he had time to obtain the drugs that were previously discussed yet ("Oh okay, shit you had time yet?"), to which MASON replied that he had ("Yeah."). GIVENS told MASON he didn't know because MASON hadn't called him back to tell him ("I ain't know you ain't never called me back.") and MASON said he just got back from obtaining the drugs ("Nah I just got back. I just went and grabbed it."). GIVENS then told MASON that he would come by his residence to pick the drugs up ("Oh okay, shit I'm about to swing by.").

26. On this same date and time law enforcement was conducting surveillance pertaining to these two phone calls. At approximately 5:44 PM, officers observed a vehicle pull up to the edge

of the property at the TARGET LOCATION. Law enforcement observed Sean GIVENS as the individual that gets out of the vehicle. GIVENS walked up onto the porch of the TARGET LOCATION and MASON exits the residence. Officers observed MASON and GIVENS do a hand-to-hand transaction on the porch and then have a short conversation. GIVENS then exits the property a few minutes later.

27. The TARGET LOCATION is the home residence of MASON. Surveillance has been conducted at this residence through electronic and in person surveillance for over thirty (30) days. MASON has been seen at the residence everyday and sleeps at the residence every night. The previous intercepted communications are only a few instances in which MASON has utilized the TARGET LOCATION to sell illegal narcotics from. Over the last 15 days MASON has sold drugs almost every day from the TARGET LOCATION in which individuals come to the TARGET LOCATION to purchase the narcotics or MASON leaves from the TARGET LOCATION to go sell narcotics and then return to the TARGET LOCATION.

## CONCLUSION

28. Based on the facts set forth above, your affiant believes probable cause exists that Ronald Lavaughn MASON has committed and continues to commit federal offenses, including but not limited to 21 U.S.C. §§ 841(a)(1) and 846. Your affiant believes that probable cause exists for a search warrant to enter the premises at 205 Gregory Street, Beckley, Raleigh County, West Virginia 25801 (TARGET LOCATION) to search for and seize fruits, evidence, and instrumentalities of the specified federal offenses. Your affiant further believes there is probable cause to believe that at the time of the execution of the search warrant, there will be the items, materials, and objects described in Attachment B inside the TARGET LOCATION.

29. Accordingly, your affiant respectfully requests that the Court issue: an Order granting authority to enter and search the TARGET LOCATION and an Order sealing the Search Warrant Application, Affidavit, and Search Warrant until further Order of this Court.

Further your affiant saith naught.

Respectfully submitted,

_____
Jason Redden, ATF Task Force Officer

SUBSCRIBED AND SWORN before me by telephonic means this <u>24th</u> day of May 2024.

_____
HONORABLE OMAR J. ABOULHOSN
UNITED STATES MAGISTRATE JUDGE